Donna FLANAGAN et al.

v.

Conrad WESSELHOEFT, M.D., et al.

No. 96–610–Appeal.

Supreme Court of Rhode Island.

May 22, 1998.

Steven Aaron Robinson, Providence, for Plaintiff.

R. Kelly Sheridan, David W. Carroll, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, FLANDERS, BOURCIER and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

The plaintiffs in this appeal claim that a Superior Court trial justice erred in granting the defendant doctor's motion for judgment as a matter of law in a medical malpractice action.

The plaintiffs are John and Donna Flanagan (John, Donna, or Flanagans). The defendant is Conrad Wesselhoeft, M.D. (Dr. Wesselhoeft), a pediatric surgeon. The Flanagans brought suit on behalf of their young daughter, Ashley Flanagan (Ashley), alleging therein that on September 27, 1989, Dr. Wesselhoeft negligently performed surgery upon Ashley when she was eleven months old and that before surgery he had failed to disclose to them, as Ashley's parents, both the material risks of the surgery and any available alternative treatments to the surgery in order to obtain their informed consent to the procedure. Donna also claimed that she sustained economic losses as a result of her having had to take time out from her work as a nurse in order to care for her daughter following corrective surgery on Ashley that was performed in New York by another pediatric surgeon.

## I

### Facts and Case Travel

In August 1989 the Flanagans noticed a small growth, or node, that had developed on the neck of their eleven month old infant daughter, Ashley, just below her right ear. The Flanagans brought Ashley to be seen by Dr. Wesselhoeft on the recommendation of Ashley's pediatrician. Doctor Wesselhoeft met with the Flanagans and Ashley for some five to seven minutes at his office, where he examined Ashley, palpated the node, and informed the Flanagans that the node would have to be removed by excision and subjected to a biopsy. It is undisputed that during that brief office meeting and examination Dr. Wesselhoeft did not discuss with the Flanagans any alternative treatment other than surgery, and with regard to the surgery no material risks associated with the surgery other than bleeding and infection were mentioned. Doctor Wesselhoeft scheduled Ashley for surgery on September 27, 1989, and from the time of his first meeting with the Flanagans, had no further discussion with them regarding Ashley's scheduled surgical procedure.

On September 27, 1989, the Flanagans brought Ashley to the Rhode Island Hospital,

where she was turned over to staff personnel to prepare her for surgery. The Flanagans at that time did not see or meet with Dr. Wesselhoeft. That morning, Dr. Wesselhoeft performed the cervical node excision, which took six minutes. The Flanagans met the defendant doctor in the hospital corridor after the surgery had been performed, and he told them that all had gone well. The following week, Donna took Ashley to see Dr. Wesselhoeft for a postoperative visit. He informed her that the excised node revealed no malignancy. He examined Ashley and informed Donna that the incision appeared well healed, and he discharged her from his care.

Some four weeks later, in October 1989, Donna began to notice that Ashley's right shoulder appeared to be "dipping." By December of 1989 Ashley's condition had worsened to the point that her right shoulder had dropped and her scapula and her shoulder rotation bone appeared to be "winging" forward, and although then only fourteen months old, the child was in obvious distress. Donna took her daughter to be examined by her pediatrician, H. Bickford Lang, M.D. He suggested that Ashley be seen by a Michael G. Ehrlich, M.D., but instead Ashley was taken to and seen by a Taranath Shetty, M.D. (Dr. Shetty), who performed an electromyogram. Doctor Shetty informed the Flanagans that their daughter had a "problem" and that it appeared to be with one of the nerves in her neck. The Flanagans, being acquainted with a pediatric physician in Washington, D.C., sought his advice, and he recommended that Ashley be examined by Melvin Rosenwasser, M.D. (Dr. Rosenwasser), a pediatric surgeon at New York Presbyterian Hospital in New York City.

Doctor Rosenwasser diagnosed Ashley with a possible spinal nerve injury. In order to confirm that diagnosis, he performed exploratory surgery on February 16, 1990. During the course of that exploratory surgery, he discovered that his diagnosis was correct. The spinal accessory nerve in Ashley's neck had been severed by Dr. Wesselhoeft during the earlier surgical removal of the benign node in Ashley's neck. Fortunately Dr. Rosenwasser was able to locate the severed nerve ending, which had become encased in scar tissue. By use of an 8–0 stay epineural stitch, he was able to successfully reconnect the severed nerve endings, thereby permitting the spinal accessory nerve to come into apposition without tension. Ashley was later discharged from Dr. Rosenwasser's care in late February. She was required, however, to wear a neck collar, ace wrappings around her stomach area along her chest, and a plastic right arm brace that held and confined her arm against her chest. She was relieved of her arm sling in June of 1990, and in September of 1990, seven months after her second surgery, young Ashley was freed from her body wrappings. Fortunately, thanks to Dr. Rosenwasser's surgical ability, Ashley is now fully recovered.

On September 24, 1992, the Flanagans filed their medical malpractice claim against Dr. Wesselhoeft, a Bette–Jean Gillerin, M.D. (Dr. Gillerin), a resident physician employed by Rhode Island Hospital, and the hospital. The claims against Dr. Gillerin and the Rhode Island Hospital have been resolved and are not before us in this appeal.

In preparing for the trial of their claim against Dr. Wesselhoeft, the Flanagans were required to look to an out-of-state pediatric surgery medical expert to assist in their claim. That was necessary because at that time there were only three pediatric surgeons then practicing in Rhode Island, including the defendant Dr. Wesselhoeft, and all three were associated for practice in the same office. Counsel for the Flanagans retained a Theodore Brand, M.D., (Dr. Brand), a board-certified pediatric surgeon practicing in Atlanta, Georgia. In preparation for trial Dr. Brand was deposed by videotaped deposition. In that deposition it was brought out that Dr. Brand had graduated from Northwestern University Medical School in 1978 and thereafter had completed both his internship and his general surgical residency at Michael Reese Hospital in Chicago, Illinois, from 1979 through 1984. Following his residency he was granted a fellowship in pediatric surgery at Children's Hospital in Seattle, Washington, from 1984 to 1986, after which he began private practice in Atlanta, Georgia, as a pediatric surgeon. He is a

fellow of both the American Academy of Pediatric Surgeons and the American College of Surgeons, Pediatric Section, and is board certified in both general and pediatric surgery. Doctor Brand has also been granted staff privileges at nine separate medical hospitals and institutions in Georgia and has been licensed to practice medicine in the states of Washington, Illinois, and Georgia. He is presently retained by the Scottish Rite Children's Hospital to instruct surgical residents in pediatric surgical techniques. In addition Dr. Brand testified during his deposition that in the course of his practice as a pediatric surgeon he had performed in excess of several hundred cervical lymph node excisions.

The Flanagans' civil malpractice action was reached for trial on July 23, 1996. During trial, on July 25, counsel for Dr. Wesselhoeft filed a motion in limine to prevent the introduction of the deposition testimony of Dr. Brand. The motion was based primarily upon the alleged inability of Dr. Brand to testify in regard to his knowledge of the standard of care for pediatric surgeons practicing in Rhode Island while performing a cervical node excision as well as with regard to the standard in Rhode Island for informing a patient of the material risks associated with that surgery. The trial justice granted the defendant's motion in limine, thus preventing the plaintiffs from using Dr. Brand's testimony to establish their claims against Dr. Wesselhoeft.

The plaintiffs' counsel then attempted to gain support for the Flanagans' claims by his questioning of the defendant Dr. Wesselhoeft as an adverse party witness. Doctor Wesselhoeft successfully evaded any questions concerning the standard of care for pediatric surgeons in Rhode Island and refused to acknowledge any medical treatise as sufficiently authoritative in the field of pediatric surgery to define the care required in performing cervical node excision surgery. Doctor Wesselhoeft's evasive answers, coupled with the trial justice's exclusion of Dr. Brand's deposition testimony, destined the Flanagans for the certain judgment as a matter of law doom that quickly followed. For the reasons that follow, we reverse.

## II

## Motion for Judgment As a Matter of Law On Plaintiffs' Negligence Claim

■ The trial justice, in granting the defendant's motion for judgment as a matter of law on the Flanagans' negligence claim, stated:

> "As to the count alleging medical negligence, the Court has already ruled that the testimony of the proffered expert, Dr. Brand, is to be excluded for reasons that I elaborated upon this morning. Based upon that exclusion, the count for bad medicine must fall, and the motion is granted relative to that count."

The trial justice's reference to her earlier exclusion of the proffered deposition testimony of Dr. Brand was based upon the absence in the deposition of any testimony by the doctor that he was familiar with the standard of care applicable to pediatric surgeons practicing in Rhode Island. At the time of the trial justice's ruling it is understandable that she of course could not have been aware of our recent holding in *Sheeley v. Memorial Hospital*, 710 A.2d 161 (R.I.1998), decided after the Flanagans' trial. In *Sheeley*, we joined the growing number of jurisdictions that have done away with the same or similar community standard of care test and have adopted instead the rule requiring a medical doctor to use the same degree of care and skill expected of "a reasonably competent practitioner in the same class to which he or she belongs, acting in the same or similar circumstances." *Id.*, at 167.

Even though the trial justice's ruling predated our holding in *Sheeley*, we conclude that the trial justice nonetheless erred in excluding the entire deposition testimony of Dr. Brand. In his deposition Dr. Brand had testified in part that

> "if a surgeon, *any surgeon* were to perform a cervical lymph node biopsy without paying attention to the presence of the nerve and thus injured it, if one was—if a surgeon was not paying attention to the presence of the nerve and thus injured it, whether by lack of knowledge of its presence or inattention to the safe conduct of

the procedure, that would be a deviation from the standard of care." (Emphasis added.)

The competency or expert qualifications of Dr. Brand were never questioned by the trial justice. Accordingly, rather than have relied exclusively upon our earlier case holdings in *Richardson v. Fuchs,* 523 A.2d 445 (R.I. 1987); *Young v. Park,* 417 A.2d 889 (R.I. 1980); and *Schenck v. Roger Williams General Hospital,* 119 R.I. 510, 382 A.2d 514 (1977), the trial justice should have considered the admissibility of Dr. Brand's testimony in light of G.L.1956 § 9–19–41 and Rule 702 of the Rhode Island Rules of Evidence. Rule 702, that became effective October 1, 1987, provides:

> "Testimony by experts.—If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

By virtue of § 9–19–42, Rule 702 took "precedence over any statutory or case law in effect at the time of its adoption" that was "inconsistent with the Rhode Island [R]ules of [E]vidence." Rule 702 effectively has served to trump *Richardson, Young,* and *Schenck,* all relied upon by the trial justice for her exclusion of Dr. Brand's deposition testimony.

■ We believe that Dr. Brand's deposition testimony would certainly have been of assistance to the jury on both the Flanagans' claim for negligence as well as with regard their failure to inform claim. His board cer-

tifications and his extensive knowledge, skill, and experience in pediatric surgery should have presumptively permitted his deposition testimony in the form of both fact and opinion to be admitted at trial. *Marshall v. Medical Associates of Rhode Island, Inc.,* 677 A.2d 425, 427 (R.I.1996); R.I. R.Evid. 702; § 9–19–41, 42; Mason Ladd, Expert Testimony, 5 Vand. L.Rev. 414 (1952). We conclude that the trial justice erred in excluding Dr. Brand's deposition testimony[1] and that this error resulted directly in the improper granting of the defendant's motion for judgment as a matter of law as to the Flanagans' claim of negligence.

### III

### Motion for Judgment As a Matter of Law On Plaintiffs' Lack of Informed Consent Claim

After granting the defendant's motion for judgment as a matter of law in regard to the Flanagans' negligence claim, the trial justice proceeded next to grant the defendant's motion for judgment as a matter of law as to the Flanagans' claim for lack of informed consent. In granting that motion, the trial justice reasoned that Donna's testimony could not have persuaded a reasonable jury to return a verdict in favor of the plaintiffs. Specifically the trial justice stated that she did not believe that the undisclosed remote risk of nerve damage, in light of the more severe risk that the node might be malignant, which risk had been disclosed, would have motivated Donna to pursue an alternate course of treatment for Ashley.

The Flanagans in their appeal assert that Dr. Wesselhoeft never informed them during

---

1. We further note that Dr. Brand's testimony relating to the text of a medical treatise entitled *Complications of Pediatric Surgery* should have been admitted pursuant to Rule 803(18) of the Rhode Island Rules of Evidence which exempts from the definition of hearsay,

> *"Learned Treatises.* To the extent called to the attention of an expert witness upon cross-examination or relied upon by the witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial

notice. If admitted, the statements may be read into evidence but may not be received as exhibits."

Under Rule 803(18), the decisive inquiry is whether the treatise is authoritative. In this case Dr. Brand testified that he did in fact consider *Complications of Pediatric Surgery* an authoritative text on the topic of those health risks most commonly associated with the cervical-node excision, and it is entirely proper under Rule 803 for a witness to establish by his or her own testimony the authoritative character of a treatise. The trial justice overlooked that rule and instead relied upon G.L.1956 § 9–19–30, which has been superseded by Rule 803(18).

their brief office visit that Ashley might suffer nerve damage as a result of the cervical node excision. Doctor Wesselhoeft in his brief testimony did not deny Donna's testimony regarding her recollection of what had been discussed in that first office visit. Further, the Flanagans argue that their consent was not properly given because Dr. Wesselhoeft neglected to discuss any alternatives to the surgical procedure. For example, the Flanagans were not advised as to the likelihood that Ashley's node could be benign, in which case no excision would be required, nor were the Flanagans apprised of such nonsurgical alternatives as a needle biopsy to determine malignancy.

The trial justice, in reaching her decision, apparently weighed Donna's testimony and failed to evaluate it in the light most favorable to the nonmoving party as required by Rule 50 of the Superior Court Rules of Civil Procedure and concluded that it would not have convinced a reasonable juror that the Flanagans would forego the cervical node excision had they been properly warned that nerve damage to Ashley could result from the procedure.

 It is true that a judge may grant a defendant's motion for judgment as a matter of law when the plaintiff's evidence, while offering a conflicting set of facts, is so inherently improbable that a jury could not, even in light of the evidence most favorable to the plaintiff, find the defendant had acted negligently. *Economou v. Valley Gas Co.*, 112 R.I. 514, 312 A.2d 581 (1973). We conclude, however, that no such circumstance presented itself here.[2] Indeed, a concerned mother of an eleven month old child might well have decided that the risk of nerve damage was not a risk worth taking at that time.

2. We note that a trial justice, pursuant to G.L. 1956 § 9–19–32, is instructed to weigh the credibility of witnesses in determining whether an allegation of lack of informed consent should be submitted to the jury. That statute, entitled "Informed consent a preliminary question," states in pertinent part that "issues of informed consent or reasonable disclosure of all known material risks shall be initially considered by the court as preliminary questions of fact. Such issues shall be submitted to the jury by the court only in the event that it finds, after weighing the evidence and considering the credibility of the witnesses,

More importantly, the trial justice's finding that Donna's testimony was unpersuasive hinged upon the trial justice's speculation that because the small cervical node might possibly have been malignant and might perhaps have resulted in Ashley's possible later death, the Flanagans would not have been dissuaded from consenting to surgery by the additional risk of nerve damage. This finding offends the very nature of informed consent and ignores the fact that the Flanagans were never warned of any risks other than bleeding and infection. As this court stated in *Wilkinson v. Vesey*, 110 R.I. 606, 624, 295 A.2d 676, 687 (1972), "The keystone of [informed consent] is every competent adult's right to forego treatment, or even cure, if it entails what for him are intolerable consequences or risks however unwise his sense of values may be in the eyes of the medical profession, or even the community." The essential inquiry then is not which course of treatment the trial justice, expert medical professionals, or even a reasonable person might elect. Rather, "the patient's right to make his decision in the light of his [or her] own individual value judgment is the very essence of his freedom of choice." *id.*

 In discussing the doctrine of informed consent, this court has stated that

"a patient's consent to a proposed course of treatment was valid only to the extent he had been informed by the physician as to what was to be done, *the risk involved and the alternatives to the contemplated treatment.* This theory, which today is known as the doctrine of informed consent, imposes a duty upon a doctor which is completely separate and distinct from his responsibility to skillfully diagnose and treat the patient's ills." *Wilkinson,* 110

that reasonable minds might fairly come to different conclusions * * *."

In granting judgment as a matter of law, however, the trial justice weighing evidence must do so in accordance with Super.R.Civ.P. 50, which specifically directs him or her to weigh the evidence in the light most favorable to the nonmoving party. As such, § 9–19–32 and Rule 50 do not conflict but rather are complementary and must be read in conjunction with each other. *Soares v. Vestal*, 632 A.2d 647, 648 (R.I.1993) (per curiam).

R.I. at 619–20, 295 A.2d at 685. (Emphasis added.)

We conclude that informed consent is not possible when a physician has failed to address both the material risks associated with and the viable alternatives to a recommended surgical procedure. *Crain v. Allison*, 443 A.2d 558, 561–62 (D.C.App.1982) (doctor must disclose alternative treatments); *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014, 1022 (1977) ("fundamental fairness requires that the patient be allowed to know what risks a proposed therapy entails, alternatives thereto, and the relative probabilities of success").

■ In this case the Flanagans maintain that they were never informed about the potential risk of nerve damage that Ashley might suffer as a result of the surgery. Further, the Flanagans contend that Dr. Wesselhoeft neglected to apprise them of the alternative of a needle biopsy procedure that could have obviated the need for surgery altogether. The testimonial evidence presented in support of these allegations was more than sufficient to withstand the defendant's motion for judgment as a matter of law as to the Flanagans' claim for lack of informed consent.

In this case we conclude that the plaintiffs' evidence in support of their lack of informed consent claim presented a reasonable minds could differ scenario and that that claim, therefore, should have been submitted to the jury.

## IV

### Donna Flanagan's Economic Losses

The Flanagans next claim that the trial justice erred in ruling that Donna could not properly testify about the economic losses that she allegedly suffered as a result of Ashley's injuries. During the trial Donna attempted to testify that Ashley's physical condition following her surgery necessitated frequent trips to seek medical diagnosis and treatment. As a consequence Donna was forced to both reduce her hours of work and to incur additional out-of-pocket expenses. Upon objection by defendant's counsel, however, the trial justice excluded that testimony. Since the trial justice gave no reason for her ruling, we are left to presume that she adopted the reasoning offered by objecting counsel. In objecting to Donna's testimony regarding her own economic losses, defense counsel stated "[t]hat the only thing recoverable under Rhode Island law, the child's pain and suffering; number two, maybe loss of comfort and society between the mother and the child; number three, theoretically, but not applicable in the case would be damage which would be recoverable under *Marchetti v. Parsons*."[3]

■ We find defense counsel's categorization of those damages that are recoverable in a negligence claim under Rhode Island law wholly lacking. There exist no discrete categories that limit the amount or the type of damages that a plaintiff alleging negligence may recover. Rather victims of a negligent tortfeasor are ordinarily permitted to recover for all the injuries and damages that can be proven to have been reasonably foreseeable and proximately caused by the tortfeasor's negligence. *Atlantic Tubing & Rubber Co. v. International Engraving Co.*, 528 F.2d 1272 (1st Cir.), *cert. denied*, 429 U.S. 817, 97 S.Ct. 60, 50 L.Ed.2d 77 (1976); *Hueston v. Narragansett Tennis Club, Inc.*, 502 A.2d 827 (R.I.1986); *Prue v. Goodrich Oil Co.*, 49 R.I. 120, 140 A. 665 (1928).

■ Under this rule of law the trial justice's unexplained finding that Donna's economic losses were per se not recoverable was error. Such damages are recoverable as long as they were proximately caused by a

---

**3.** In *Marchetti v. Parsons*, 638 A.2d 1047, 1052 (1994), this court held that

"in order to recover for negligent infliction of emotional distress, a party must (1) be a close relative of the victim, (2) be present at the scene of the accident and be aware that the victim is being injured, and (3) as a result of experiencing the accident, suffer serious emotional injury that is accompanied by physical symptomatology."

As defense counsel noted, this case has no application to Donna's challenged testimony because her testimony at that time did not concern a claim of negligent infliction of emotional distress. It is interesting, however, that the parents of the injured child in *Marchetti* had also sought compensation for their own lost wages.

defendant's alleged negligence and were reasonably foreseeable at the time of that alleged negligence.

## V

### Negligent Infliction of Emotional Distress

The Flanagans' final appellate contention raised in this appeal is that the trial justice erred in granting judgment as a matter of law on Donna's claim of negligent infliction of emotional distress. The plaintiffs in their complaint filed in the Superior Court referred to that claim as one for "extreme mental frustration and anguish." The parties in the Superior Court treated that somewhat inartful descriptive designation of claim to be in reality a claim for negligent infliction of emotional distress, and we still do likewise for purposes of this appeal.

Our review of the trial record reveals that the plaintiff Donna's claim for negligent infliction of emotional distress,[4] according to her counsel's offer of proof, would be that because of her nursing background, John, her former husband, blamed and berated her for not having known about "the health condition" of Ashley and that "there was a lot of fighting" between Donna and John that resulted in Donna's experiencing certain physical ailments, described as "grinding of her teeth, migraine headaches, stomach disorders." It appears from counsel's offer of proof and Donna's limited testimony that her complaints were actually related to her husband's conduct in blaming and berating her for Ashley's condition. Presumably that is what led to their divorce.

Viewing the trial record testimony and Donna's offer of proof in the light most favorable to her, as was required by the trial justice, we find no error in the trial justice's ruling on Donna's negligent infliction of emotional distress claim. *Reilly v. United States*, 547 A.2d 894 (R.I.1988). As pertains to that claim, the Flanagans' appeal is denied and dismissed.

For the reasons set out above, the Flanagans' appeal is sustained in part and denied

4. By the time of trial Donna and John had divorced, and Donna had remarried. John did not

in part and the judgment of the Superior Court is vacated. The papers in the case are remanded to the Superior Court for a new trial in accordance with our opinion.

testify during the trial.